UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    DEC 30 2013

WILLIAM W. BLEVINS
CLERK

CHARLES E. MARSALA

CIVIL ACTION NO:

VERUS

SECTION: **13 - 6800**
**SECT. F MAG. 5**

JERRY L. MAYO, MICHAEL GRAY, JERRY GABET,

MAGISTRATE

A&S RECOVERY, JACKSONVILLE DINING CONCEPTS, SCIBMATT, LLC

*********************************************************************************

## COMPLAINT

NOW INTO COURT, through pro se, comes petitioner, Charles E. Marsala, who respectfully avers as follows: That Marsala is entitled to a constructive trust against Mayo, Gray, Gabet, and their companies due to their unjust enrichment at his expense obtained in their roles in an ongoing-conspiracy to commit Securities Fraud, Theft by Conversion and Theft by Deception, Larceny, Breach of Fiduciary Responsibility, Fraudulent Transfer to avoid Creditors: with the conspiracy classified as on-going as a result of Fraudulent Concealment and on-going activities; with RICO laws applying due to the multiple violations of 18 USC 1961-1968.

## COLLATERAL PROCEEDINGS AND REFILED CASES

### I

Under Local Rule 3.1 Marsala advises the following:

1. Marsala first filed a related case against Mayo and Lanners in 2006 # 06-3846.

2. A settlement was reached with Lanners. which excluded Jerry Mayo, his assets, and companies of Jerry Mayo that were unjustly enriched by Jerry Mayo regardless of other investors.

3. Mayo was dismissed without Prejudice as he claimed to still be bankrupt from 2003 and not working.

4. In April 2013, Marsala filed to re-open the case and add Securities Fraud, On-Going Conspiracy, Fraudulent Concealment, Unjust Enrichment, and Constructive Trust.

Fee $400.00
√ Process
x Dktd
  CtRmDep
  Doc. No.

5. Marsala discovered that Mayo had transferred approximately $4,100,000.00 in assets in 2000 for a debt to A&S Recovery (a company which Mayo received 50% of the profits, recruited employees, and co-founded). Mayo had been able to personally loan Randy Reece $189,000.00 in 2006. Randy Reece stated in the 2006 Law Suit in Texas 06-411106 Exhibit 41: "Mayo lied to get me to sign the note." Those assets were not declared in Mayo's 2007 statement to Marsala that Mayo was Bankrupt with assets less than $100,000.00 of debt. Mayo was in the Press in 2013 as being an "Angel Investor" in Midaire.

6. In Dec 2013 Mayo was announced as the New CEO of THEPROVISIONCONCEPT.com. Mayo's bio praises his success with Ericsson- not that Ericsson sued Marketshare in 2005 for failure to pay; discusses that Mayo was developing Universal Solutions while the SVP at MCI/ Worldcom; notes Mayo International Experience during 2003- while his bankruptcy filings stated Mayo was not working; Mayo's work performed to develop a Franchise Program for Dun & Bradstreet- which was ended after Mike Myhall sued D&B for false statements made by Mayo to recruit Myhall. Also that Blackbox acquired Universal Solutions after Universal was an Inc top 30 company for two consecutive years.

7. The 89 page Provision Concept On-line Power Point (Exhibit 60) has slides which state: "We believe you have the talent to earn a 7 Figure Annual Income with this Opportunity"; "Leaving your job could be the best thing that ever happened to you!"; "Nothing like this job has ever been offered"; "There is no contract between us and never any cost".

8. Marsala filed to re-open and add constructive trust, but his motion was denied in District Court.

9. The District Court did not address the Constructive Trust Issue, nor adding co-conspirators, and the District Court never commented on Marsala's Contribution Claim against Mayo.

10. Marsala is currently waiting a decision on re-opening from the Fifth Circuit Court of Appeals.

11. However there are concerns that the Appeals Court will not address the Constructive Trust issue and time continues to pass, so a separate case is being filed to establish a claim.

12. In 2006, Mayo's response was to deny many statements by Marsala and demand proof. Gray supported Mayo's claims. In the interest of saving time, the documents and proof are filed now.

13. A 2013 US Supreme Court case; Bullock v. Bankchampaign on Constructive Trust supports Marsala.

14. Marsala avers that Profitable Dining is an Affinity Fraud- Ponzi Scheme:

15. Marsala's fraternity brothers needed cash for their partnership SCIBMATT,LLC started in 1997.

16. Mayo and Lanners set up parallel entity named Profitable Dining, LCC to recruit Marsala for $200,000.00 and they promoted 104% annual return expectations "THAT MUST BE MET" starting in year five.

17. To convince Marsala to invest, they Conspired to make Omissions and Misrepresentations- to date none of the four has divested from the group, tolling any statute of limitations per Supreme Court decisions.

18. They fraudulently mailed Marsala a letter that the structure of Profitable Dining for Capital was the same as SCIBMATT, when they had deleted the capitalization sentence in the offering. 15USC78 & mail fraud

19. They fraudulently portrayed that Profitable Dining was a "LIMITED LIABILITY COMPANY"; knowing from the Jay and Jerry Business Plan that personal guarantees would be required of Marsala.

20. They transferred Marsala's money immediately to SCIBMATT, the same day Marsala's money cleared. SCIBMATT has three Copelands Restaurants operating in Atlanta. Ex 1

21. Profitable Dining's Jacksonville was a huge success with profits over $500,000 a year in 2002- 2003; Such a distribution would be worth $60,000.00 a year to Marsala in dividends. Equal to an annuity worth $3,000,000.00 to Marsala at a 2% interest rate.

22. The other two Profitable Dining restaurants were Converted and leased or sold to Wild Wings.

23. Gray in his Deposition admitted that Marsala's money went to SCIBMATT as a Capital contribution, at $8,000.00 per percent that would be 20% equity, with annual profits over $500,000.00.

24. Lanners and Mayo inflated their net worth to obtain loans for Furniture, Fixture, and Equipment (FF&E) for these restaurants from Financial Intuitions; then defaulted in 2004 and left Marsala to pay the debt.

25. To keep Marsala from discovering what happened they violated Sarbanes-Oxley for Annual Reports and committed Perjury in their depositions and advised witnesses Michael and Cindy Gray and Jerry Gabet to agree to these false stories to cover-up the Securities Fraud. Mayo, Gabet, and Gray refused to produce documents and Lanners produced bate stamped documents after depositions and the MSJ was filed.

26. In 2001 Lanners requested more funds from Marsala, which according to Mayo's deposition were transferred to A&S Recovery for FF&E for a restaurant in Charlotte that was turned over to PRIMAX to relieve Mayo of the Personal Guarantee for the lease.

27. A&S Recovery used those funds to profit over $3,000,000.00 on FF&E it leased to GDI that Jerry Mayo paid

    for with $4,100,000.00 in Universal Solutions stock. Exhibits 26-28.

28. In 2003 Jerry Gabet set up a new company (Jacksonville Dining Concepts), Lanners and Gabet sold

    Profitable Dining's  assets to that company, stopped paying GE Finance on the assets (FF&E), leaving

    Marsala to pay. Gabet also owns Dennis Dean Catering possibly opened with the Jacksonville Profits.

29. After settling with GE Finance in 2005 for the FF&E for Jacksonville, Marsala asked Mayo to pay 1/3 of the

    settlement under contribution law. Mayo refused. Marsala began the lawsuit process just after Katrina.

30. Rather than pay Marsala his dividends and contribution, Lanners and Mayo opted to take their chances with a

    Lawsuit by Marsala. Gabet and Cindy Gray were represented by Lanners' attorney, Halsey Knapp.

31. Lanners and Mayo had Aimee Quirk represent them in in New Orleans in 2007 to present these false stories

    in a motion for Summary Judgment. Ex 66 Ms. Quirk is a former law clerk to Judge Feldman.

32. In Summary Judgment, Judge Feldman agreed with Quirk that Profitable Dining "Failed" even though

    Jacksonville never closed and its staff remained employed.  Marsala asserted that besides "Fraudulent

    Transfer to Avoid Creditors"; this is also referred to as "Acqui-Hire".  A recent lawsuit against Facebook by

    investors in Gowalla cited the action as "frustrating the ability of creditors…" ; Investors…."providing

    capital for founders to essentially buff up their resume to get their dream job."…."If a founder leaves

    stockholders to take a lucrative side deal, they're not acting ethically."  Exhibit 67

33. Since 2001, Lanners and Mayo repeatedly have not paid debts starting with FF&E vendors to Mayo's

    restaurants, Mayo's bankruptcy with $440,000.00 in credt card debt, and Ericsson Telcom on $1,000,000.00

    in product their company, Marketshare Telcom. Eriocsson sued and won in 2006.

34. Mayo per deposition paid his company, A&S Recovery, $220,000.00 from his American Express account

    and then declared bankruptcy in 2003. Thus AM/EX did not collect.

35. Mayo used Gray's Florida condo to avoid New Jersey state income taxes.

36. Lanners referred to the group as the "LA Mafia", himself as "The Dictator", and RICO applies.  EX 5

37. This filing is to show despite the difficulties in discovery and Rulings Marsala continues to assert he is

    entitled to a trail to petition for claims of Constructive Trust, Contribution, Conspiracy, and RICO.

**PARTIES:**

The Parties are:

A) Plaintiff, Charles E. Marsala (hereinafter known as Masala) a person of the full age of majority, and a domiciliary of Monroe, LA.

B) Jerry L. Mayo, (hereinafter known as Mayo) individually and in his capacity as managing member/ majority shareholder in Profitable Dining, LLC, A&S Recovery, LLC, Jerry Mayo Investments, Marketshare, Lanners-Dining-In, Universal Solutions, Sure Thing, and other companies. A resident of New Jersey.

C) Michael Gray, (hereinafter known as Gray) individually and in his capacity as managing member/ majority shareholder in SCIBMATT, LLC and A&S Recovery, LLC. A resident of Georgia.

D) Jerry Gabet, (hereinafter known as Gabet) individually and in his capacity as managing member/ majority shareholder in SCIBMATT, LLC, Profitable Dining, and Jacksonville Dining Concepts. A resident of Florida.

E) Jacksonville Dining Concepts, LLC a foreign limited liability company registered in the state of Delaware. In 2001, Marsala's funds paid GE Finance for the FF&E and Copeland's for the Franchise Fees of Jacksonville. Ex 1

F). A&S Recovery, LLC a foreign limited liability company registered in the state of Delaware.  A large part of Marsala's loan to Profitable Dining of $250,000.00 in 2001 was transferred in part to A&S Recovery per Jerry Mayo's deposition to fund the purchase of FF&E that was exchanged with Mayo for $4,100,000 in stock.   Profitable Dining shows $12,000.00 due to Marsala on a separate loan to A&S in 1998.  Ex 2

G) SCIBMATT, LLC a foreign limited liability company registered in the state of Delaware, owned 37.5% by Mayo 1997-2000, who was excluded in the Lanners' settlement. $160,000 (per a Lanners spread sheet $190,000.00) of Marsala's investment was transferred to SCIBMATT as capital for Mayo and Gray. Exhibit 3

H) Other Companies of Mayo, Gray, and Gabet may have benefited as derivatives which will require discovery to trace Marsala's funds. For instance A&S Recovery received $4,100,000.00 in 2005 from the sale of Universal Solutions stock it received from Mayo, how Gray has used that money is unknown.

I) DTD, LLC and Lanners-Dining-In, which owns real estate for Copelands and were released in part by settlement with Jay Lanners; but excluded for the percentage owned by Jerry Mayo.  Mayo applied his $83,750.00 commission

from the sale of stock to Marsala towards real estate owned by Lanners-Dining In. Per Georgia Codes excessive commissions (in this case 43.75% are prohibited). Per Corporate Bankruptcy or "failure" guidelines, secured creditors are to be paid first; however with Profitable Dining over $1,100,000 of unsecured debt to Mayo and Lanners' companies was paid while defaulting on $740,000.00 of secured debt to General Electric Finance.

## JURISDICTION AND VENUE

### II.

Jurisdiction is founded on 28 U.S.C. 1332, in that the amount in question exceeds the sum of $75,000.00, exclusive of interest and cost, and there is complete diversity among the parties.

### III.

Venue is proper in this Court pursuant to 28 U.S.C. 1391 (a) (2), because the Eastern District of Louisiana is the judicial district in which a substantial part of the events, including the securities offering, giving rise to this claim occurred; or alternatively, venue is proper in this Court pursuant to 28 USC 1391 (a)(3).

Marsala, Lanners, and Mayo signed an Operating Agreement that Georgia Law applies.  Gabet bought 32% of Profitable Dining, which was hidden from Marsala; it is unknown if Gabet signed the Operating Agreement. Gray did not sign the Operating Agreement.

## FACTS

### IV.

Marsala's funds ($200,000) invested in 1998 and loaned ($250,000) in 2001 to Profitable Dining were transferred in a defalcation of fiduciary duty to SCIBMATT (Exhibit 1), A&S Recovery (Exhibit 2), and other companies owned by Jerry Mayo, Mike Gray, and Jerry Gabet plus his funds ($65,000) directly paid to GE Finance in 2005 (Exhibit 3) were used to pay for the FF&E in Jacksonville Dining Concepts' Copeland Restaurant.

### V.

Thus under Constructive Trust, US Supreme Court in Bullock v. Bankchampaign, Marsala has a claim against those companies for the profits generated as a result of Marsala's funds.  GA Code 53-12-132.   Exhibit 4

**VI.**

As noted in the law suit by Ericsson Telcom against Mayo and Lanners' company Marketshare Telcom; Lanners and Mayo have enough of a history of deception, misrepresentations, and omissions, and credit defaults in their dealings with others, that Lanners has referred to the association of Mayo, Lanners, and two others as the "Louisiana Mafia". RICO laws were written to attack Organized Crime especially the Mafia.   Exhibit 5

**VII.**

Marsala(Tulane '82), Dr. Clark Warden (Tulane '81), and Dr. Pete Avara were the victims of an Affinity Fraud-Ponzi Scheme, titled the "Jay and Jerry Business Plan", created by Mayo and Lanners, benefiting, and facilitated by Gabet and Gray; which relied on the Fraternal Brotherhood, trust, and on-going friendships between Lanners(LSU '83), Mayo(Tulane '79), Gray(Tulane '83), Warden, and Marsala, members of Delta Tau Delta Fraternity. Exhibit 6

**VIII.**

Over the years the Tulane Delts had stayed close by spending Mardi Gras together, riding on the Baccagator Float, taking adventure vacations, and spending Memorial Day weekend at Gray's beachfront condo in Pensacola.   The vacations included team building activities such as mountain climbing, white water rafting, and scuba diving.

**IX.**

The Jay and Jerry Business Plan was a Conspiracy of Securities Fraud, Larceny, Theft by Conversion, Financial Institution Fraud, and Fraudulent Transfer to Avoid Creditors, obtained by Fraudulent Concealment, and violations of Sarbanes-Oxley for failure to provide annual reports per General Accounting Principles. Exhibit 7

**X.**

Lanners' objective in this plan was to recruit Mayo to sell shares in their company, Profitable Dining, LLC to Mayo's friends and fraternity brothers, by omissions and misrepresentations and claiming that investor expectations of annual returns of 104% starting in year five "Must be met" with Mayo earning 40% or more as commissions. (violating Securities Rule 15USC77 - 10b-5 for Fraud).  Since Mayo needed cash for SCIBMATT, this was a win for Mayo. Exhibit 8

## XI.

Despite Marsala's best efforts, such as taking the depositions of all four plus Gabet's daughter (Laura Baker) and Gray's wife (Cindy) who did the Finance for SCIBMATT and A&S Recovery respectfully, the evasiveness has kept some details concealed. Cindy Gray, Jerry Gabet, and Laura Baker were represented by Lanners attorney Halsey Knapp in Depositions and frequently stated "I do not recall." (Gabet more than 150 times). Marsala has tried to avoid a second lawsuit, but the parties refuse to answer 2012 emails. Exhibits 30, 31, 32

## XII.

Rather than provide Marsala with answers to a few questions, his fraternity brothers have sought sanctions, dismissal through statute of limitations, and other means. After eight years, tens of thousands of dollars, and dozens of filings; the case has always been a few questions. A: When Marsala was sold shares of Profitable Dining the Capitalization sentence was deleted, yet the cover letter stated the Operating Agreement was the same as SCIBMATT which had a Capitalization Sentence and required all parties to pay for their shares; was this omission and misrepresentation done to obtain by deception $200,000.00 from Marsala plus leave Marsala to pay for Furniture, Fixture, and Equipment for an ongoing business as Part of Jay and Jerry increase their net worth by $13,000,000 scam? If not does anyone have an answer? Why wasn't Marsala told his funds were going to be transferred to SCIBMATT the same day they cleared; was this because all knew Marsala wanted to invest in SCIBMATT and would have declined on Profitable Dining? Why not tell Marsala that Gabet had bought 32% of the company but did not have to sign personal guarantees, at a time when Marsala was being asked to sign more personal guarantees? The pressure by Lanners to get Marsala to sign millions in Personal Guarantees, while Lanners and Gabet planned to default to those creditors is theft by deception.

## XIII

Marsala subpoenaed the records of SCIBMATT and A&S Recovery, but Gray refused to supply them, falsely writing (mail fraud 18USC 1961-1968) to Marsala that there were no financial transactions between SCIBMATT and Profitable Dining; and SCIBMATT and A&S's dealings "were none of Marsala's business". Exhibit 9

## XIV

Gray also refused to supply the Operating Agreement of SCIBMATT, claiming that Marsala had no right to ask for it, Mayo and Lanners had misrepresented Profitable Dining's Capitalization Section 4 was the same as SCIBMATT. Exhibits 13 & 14

## CONSTRUCTIVE TRUST, FRAUDULENT CONCEALMENT, AND ON-GOING CONSPIRACY

### XV

Since 2005 Marsala has attempted to obtain the information as to the transfers of his funds.  Mayo and Lanners have fraudulently denied the transfer of Marsala's funds to any of their companies. Gray has supported Mayo and Lanners efforts and Gabet claims he "Does not remember"  Ex 9,10, 15, & 61

### XVI

### SECURITIES FRAUD AND TRANSFER TO SCIBMATT IN 1998 OF $160,000

Since Marsala did not file a Constructive Trust claim against Mayo in 2006 and thus could not have dismissed such a claim, and Marsala excluded Mayo in his settlement with Lanners; Marsala claims Constructive Trust against Mayo for the Transfer of $160,000.00 to Mayo's Company SCIBMATT- value 20%.   Exhibit 3

### XVII

SCIBMATT'S stock was selling for $8,000.00 per percent thus Marsala would have 20%.  Exhibit 5

### XVIII.

Gray stated in his deposition that Marsala's money went to the Capital of SCIBMATT. SCIBMATT currently operates three Copelands in the Atlanta Area with profits expected to be over $500,000.00 annually. Exhibit 6

### XIX.

In 2005, Lanners responded to Marsala's emails asking for a list of any companies of Lanners or Mayo's that received any funds from Profitable Dining, challenging Marsala that Marsala was accusing his friends of "screwing him"; and that questions on money transferred that A&S Recovery did not "Ring a Bell". Exhibit 10

### XX

Later Lanners falsely emailed that Marsala's funds were "loaned" to A&S Recovery in 1998 after sitting for months in the Profitable Dining checking account and repeated in Lanners Deposition.  Exhibits 10 & 66

## XXI

Lanners, Mayo, and their attorneys were able convince the District Court in 06-03846 that a loan to A&S in 1998 happened; ignoring Doc 72-6 submitted by Marsala's attorney, showing that Marsala's funds were immediately transferred to SCIBMATT. Exhibits 1, 11, & 12 Information required to be disclosed under Rule 10b-5

## XXII

This Order and Reason ruling has been appealed to the Fifth District Appeals court citing Turner v. Pleasant; for a Judge "relying heavily" on pleadings of a familiar defense counsel over evidence.  Exhibit 17

## XXIII

Lanners and Mayo have continued to maintain and rely on the District Court ruling, maintaining the conspiracy.

### TRANSFER TO A&S Recovery IN 2001 OF @ $200,000.00

## XXIV

In 2007, Gray was subpoenaed to supply documents as to the transactions of Profitable Dining and his companies SCIBMATT and A&S Recovery.  He refused. Exhibit 9

## XXV

Per notes of Lanners, statements made by Mayo in Deposition, and files Lanners sent to Marsala in 2003, it appears approximately $150,000.00 to $220,000.00 of a loan Marsala made to Profitable Dining starting in March 2001 was transferred to A&S Recovery and not repaid. Thus Marsala claims a Constructive Trust in the profits of A&S Recovery.  Exhibit 2

## XXVI

This is a substantial claim as A&S Recovery received approximately $4,100,000.00 in 2005 for the Universal Solutions stock that was acquired from Mayo.  Exhibit 18

**PAYING JACKSONVILLE DINING CONCEPTS DEBTS IN 2005 FOR $32,500.00 AND PAYING FOR THE INITIAL START-UP COSTS IN 2001**

### XXVII

At some point Lanners left SCIBMATT, LLC no details have been given. However in 2003, Lanners contracted with SCIBMATT and Gabet to Manage Profitable Dining. No files are emails were produced regarding this.

In 2004, Gabet, Gray, Lanners, and SCIBMATT defaulted on the debt to GE Finance for the Furniture, Fixture, and Equipment in Jacksonville; Marsala was forced to pay GE through a personal guarantee. At the time the debt to GE Finance for Tampa and Jacksonville was approximately $440,000.00.

### XXVIII

The Jacksonville Copelands restaurant had produced profits in 2002 and 2003 of over $400,000.00, and according to Lanners could produce as much as $600,000.00 to $1,000,000.00 per year.  Exhibit 19

### XXIX

Lanners had a plan to "Squeeze-Out" Marsala, leave Marsala to pay the $400,000.00 debt due to GE Finance and buy Jacksonville back from the landlord.  The plan was developed in March 2003, included selling 32% of the company to Jerry Gabet for less than $1,300.00 per percent and having Gabet or Primax create a new company, Jacksonville Dining Concepts. Exhibit 20

### XXX

Such an action is called a "Fraudulent Transfer to Avoid Creditors" per GA Code 18-2-74. Exhibit 21

### XXXI

 Gabet the COO of Profitable Dining has operated Jacksonville and used its profits to open Dennis Dean Catering. The doors of Jacksonville never closed. Exhibit 22

### XXXII

Gabet acquired Jacksonville from PRIMAX, the landlord in 2006.  Exhibit 22

### XXXIII

Thus Marsala has a Constructive Trust claim against Jacksonville Dining Concepts.

### XXXIV

Prior to executing the Jacksonville plan, Lanners had his accountant and attorney state Lanners' $6,000,000.00 in net worth had evaporated and GE Finance should look to Marsala for payment.  Exhibit 23

### XXXV

During this time Lanners and Mayo were fraudulently emailing Marsala that they were pushing GE to forgive Marsala's Personal Guarantees. Exhibit 24

### XXXVI

Lanners and Mayo had executed a similar scheme during 2000-2001.

### XXXVII

Mayo had established Garden District Investments, LLC (GDI) in 1995 with Dr. Clark Warden and Dr. Pete Avara, each had 25% equity for an investment of $200,000.00.  Exhibit 25

### XXXVIII

GDI was not a "Limited Liability" company either as all partners signed personal guarantees.

### XXXIX

Guarantees were to Lanners-Dining-In, DTD, and A&S Recovery all companies owned by 49-51% by Mayo.

### XXXX

The A&S Recovery loan to GDI was at 31% interest for @ $210,000.00.  Drs. Warden and Avara did not know Mayo was getting half the interest they were paying A&S Recovery. Exhibit 26

### XXXXI

Drs. Warden and Avara ended up filing bankruptcy and listing A&S Recovery, DTD, and Lanners-Dining-In as creditors. Exhibit 27

### XXXXII

Lanners asked Marsala in early 2001 to loan Profitable Dining $250,000.00 for the acquisition of Mayo's restaurants in Charlotte, Pineville, and Winston-Salem; operated under the company C'est Si Bon.

### XXXXIII

Marsala forwarded $150,000 to Lanners in March with an additional $100,000.00 in August.

### XXXXIV

Mayo's deposition, Lanners notes, and files sent to Marsala by Lanners indicate and support that Marsala's funds were transferred to A&S Recovery to pay for the Charlotte FF&E. Mayo stated in deposition that he had put $220,000.00 on his AM/EX card to pay A&S and was reimbursed when Marsala funds were transferred. Exhibit 28

### XXXXV

Gray also pursued Drs. Warden and Avara for their personal guarantees on the FF&E per his deposition and Warden and Avara's bankruptcy statements.

### XXXXVI

Mayo transferred his Universal Solutions stock (worth $3,400,000.00 at the time and $4,100,000 in 2005 when sold) to A&S/ Gray as his payment to A&S on the FF&E per his depositions to Ericsson and Marsala. Exhibit 29

### XXXXVII

Lanners drafted a document in 2000 to remove Mayo's assets prior to Mayo filing bankruptcy. Exhibit 31

### XXXXVIII

Gray was evasive and avoided answering questions in his deposition regarding the time and value of his acquisition of Mayo's Universal Solution stock. But knew the 24 month preference period had passed.

### XXXXIX

13

Marsala has a constructive trust against A&S Recovery has his funds were used to pay for the FF&E that A&S collected over $4,100,000.00 worth of Universal Solutions stock from Mayo.

## XXXXX

Other FF&E creditors of Mayo, and GDI were not paid, with Lanners acquiring the FF&E for free or as some might conclude by Financial Intuition deception. Exh 32

## XXXXXI

Mayo, Lanners, and their attorneys falsely presented to the court that Mayo's default to creditors allowed Profitable Dining to obtain the FF& E in all three C'est Si Bon restaurants for free.  Exhibit 33

## XXXXXII

To obtain the credit to buy the FF&E, Lanners and Mayo overstated their net worth on Financial Statements, such as Lanners claiming his $200,000.00 investment in Profitable Dining was worth $704,000.00 because Lanners and Mayo were able to deceive Marsala to pay $16,000.00 per percent. Exhibit 34

## XXXXXIII

However Lanners never invested $200,000.00 for equity in Profitable Dining and told the District Court he was to receive his shares for "Sweat Equity"; contradicting what Lanners emailed Mayo in 2005 regarding Marsala's questions on Equity and the operating agreement which required Lanners and Mayo to sell shares to raise funds for Profitable Dining. Exhibit 35 and 13

## TRANSFERRING $160,000 OF MARSALA'S INVESTMENT TO SCIBMATT

## XXXXXIV

As Gabet stated in emails and his deposition and Lanners wrote in a letter to Bill Copeland, SCIBMATT needed large sums of cash to open four Copelands in Atlanta at once in order to prevent others from purchasing the rights; Gabet told an Atlanta it cost $3,600,000.00 to open one store in 1997. Exhibit 36

## XXXXXV

From January to May 1998, Mayo had arranged for Marsala to share Bob Scott's house in New Orleans.

## XXXXXVI

During this time Mayo advised Marsala and showed him faxes from Knoxville that a Copelands made $300,000.00 per year in profits.

## XXXXXVII

In March, 1998 Marsala offered to buy shares of SCIBMATT for Atlanta and was told, no shares were available; even though SCIBMATT needed large sums of money. Gabet told the press $3M per store.

## XXXXXVIII

In April, 1998 Mayo and Lanners met with Marsala to discuss Marsala purchasing shares of Profitable Dining; they omitted telling Marsala several material facts that would have caused Marsala not to invest: 1. That Atlanta development costs were running over budget 2. That his funds would be transferred the same day to SCIBMATT 3. There was a rush to obtain Marsala's funds before a May 8, 1998 Copelands Franchise meeting to solidify the Atlanta market. 4. That they had deleted the Capitalization sentence in the Operating Agreement so that neither of them had to put in cash (not in the form of loans) for their equity.  Thus violating Rule 10b-5 in the sale of a Security and committing theft by deception and conversion (Larceny).  5. That they could force Marsala out at any time  Ex37

## XXXXXIX

Thus giving Marsala a Constructive Trust against Mayo's shares in SCIBMATT for unjust enrichment.

## EVASIVE ACTIONS, CONSPIRACY, AND FRAUDULENT CONCEALMENT CONTINUE

## XXXXXVII

Prior to filing this lawsuit, in the last twelve months Marsala attempted to resolve differences and confirm his assertions of fraud, theft by conversion and deception, and breach of fiduciary responsibility.  Mayo, Lanners, and Gray refused to respond continuing the Fraudulent Concealment and On-Going Conspiracy; Gabet often responded "I do not remember" or to deny facts contradicted by evidence, such as when he acquired and interest in Profitable Dining.  Exhibits 36 and 46:  Conspiracy Slight evidence: Tomplain V. US 5th Circuit

## ESTABLISHING A PATTERN OF DECEPTION AND RICO

XXXXXX

Mayo, Lanners, Gray and their companies A&S Recovery and Marketshare Telcom have been sued twice before in the Fifth District.

XXXXXXI

In 1998, Michael Myhall sued A&S Recovery and attempted service on Marketshare claiming, Mayo as an agent representing A&S Recovery mislead him with a job opportunity to manage A&S's seven states of Dun & Bradstreet's Receivable Management Services Division.  Exhibit 37

XXXXXXII

In Summary Judgment, Myhall established that Mayo's active role in the management of A&S Recovery qualified him as an agent, owner, or partner.

XXXXXXIII

In 2005, Ericsson Telcom sued Marketshare Telcom, a Mayo & Lanners Company, for failure to pay over $1,000,000.00 in invoices and making false and misleading statements to customers and dealers. Exhibit 38

XXXXXXIV

After Ericsson won the lawsuit, Marketshare Telcom declared bankruptcy. Exh 39

XXXXXXV

However Marketshare continued to operate and sell Ericsson products it had in inventory. Exhibit 40

**LANNERS 2001 STATEMENTS TO CREDITOR'S THAT MAYO WAS DEFUNCT,  MAYO'S 2003 BANKRUPTCY STATEMENT, AND HIS 2007 STATEMENT TO MARSALA ARE ALL FALSE**

XXXXXXVII

In 2006, Mayo through Marketshare sued Randy Reece for $189,000.00 for breach of contract after Mayo loaned Reece $189,000.00 to develop Marketshare's market in Southern California for Ericsson Telcom products, after Ericsson had terminated Marketshare.   Reece stated in a Declaration: "Mayo lied to get me to sign the note."  Ex  41

## XXXXXXVIII

Mayo stated he had transferred the loan from his personal account in 2006 to Marketshare; Marketshare won a

judgment of $270,000.00 against the home of Randy Reece.

## XXXXXXIX

Mayo filed bankruptcy in February 2003 with over $400,000.00 in credit card debt while working in Dubai as

President of Universal Solutions North Africa and Middle, traveling Europe, and falsely stating he had no income, no

living expenses, no co-debtors, and no secured debtors. The bankruptcy closed August 2003. Ext 42

## XXXXXXX

However Mayo had $189,000.00 in 2006 to loan Randy Reece, less than three years after his 2003 bankruptcy and

still stated in 2007 to Marsala that he had remained bankrupt since 2003.  This establishes that Mayo's 2007

Financial Statement of having $100,000 more in debt than assets was fraudulent.  Mayo won a $270,000.00

Judgment against Reece. What other assets would Mayo have in 2006 to be able to make such as loan?

## XXXXXXXI

Mayo emailed Marsala in April 2003, inviting Marsala to visit and scuba dive the Red Sea on a live-aboard dive ship;

not something a bankrupt person should be able to afford. Exhibit 43

## XXXXXXXII

In June 2003, Avaya Telcom through a press release announced it had signed a long term exclusive contract with

Mayo and Universal Solutions in Dubai; at Mayo was declaring on his bankruptcy he had no income and no living

expenses.  Exh 44

## XXXXXXXIII

In August 2005 Bob Scott, Mayo's partner in Universal Solutions, sold Universal Solutions to Blackbox for

$21,000,000.00 excluding contracts Universal Solutions had with Marketshare and Jerry Mayo Investments. Scott

later sued Black Box. Exhibit 45

Gray would have netted $4,100,000.00 from the sale; yet was evasive in deposition to Marsala stating he had received only $500,000.00 and there was a lawsuit in process.

For years Gray allowed Mayo, who lived in New Jersey, to use his condo in Florida as Mayo's address for tax filing, thus avoiding New Jersey income tax of 10%. Exhibit 46

Mayo's discovered tax returns of 1996-1998 do not support that he was worth the $13,000,000.00+ he was telling creditors to obtain loans on FF&E and leases.

XXXXXXXIV

In 2006, SCIBMATT, under Gray, sued and settled a lawsuit against Gabet, for Gabet's acquisition of Jacksonville Dining Concepts, which owned the Jacksonville Copeland's, formerly owned by Profitable Dining.   Under SCIBMATT Management, the Debt to GE Finance stopped being paid, but not other vendors.  Gabet denied knowledge of who made the decision to do this. But it did end Profitable Dining and put in play the ability for someone to acquire a $500,000.00 annual profit restaurant.

XXXXXXXV

Lanners stated three times in his deposition to Ericson that he "sold the assets of Profitable Dining"; however in his deposition to Marsala he stated Profitable Dining "failed" which the District Court accepted.   A concept called an "Acqui-hire".

CAUSES OF ACTION AGAINST CO-CONSPIRATORS GRAY, MAYO, and GABET and THEIR

COMPANIES

XXXXXXXVI

Marsala asserts that Mayo and Lanners made false and misleading statements to Marsala to convince Marsala to invest $200,000.00 for 12.5% of an unregistered security, Profitable Dining, LLC, they sold to Marsala.

Since the Capitalization sentence was deleted in the Offering,  Marsala paid $200,000 for 12.5% of a company whose value was only his $200,000 (confirmed by Mayo in deposition), a Shotgun Buy/Sell agreement allowed Mayo and Lanners to force Marsala to turn over his shares providing for theft by deception.

Marsala asserts that on three occasions his funds were used for the unjust enrichment of Mayo, Lanners, and Gray through their companies SCIBMATT, A&S Recovery, and Jacksonville Dining Concepts entitling him to Constructive Trust.

## RICO ACTS THAT ALLOW FOR DAMAGES 18USC:

section <u>1341</u> (relating to mail fraud), section <u>1343</u> (relating to wire fraud), section <u>1344</u> (relating to financial institution fraud),  section <u>1503</u> (relating to obstruction of justice),  <u>1512</u> (relating to tampering with a witness, victim, or an informant. Fraud in the sale of securities, Perjury.

Lanners and Mayo both committed numerous acts of perjury in their depositions and declarations in 2007. The stories they told to the court, were before Marsala was given forty-one boxes of discovery which had evidence to contradict their stories such as the checks to SCIBMATT, the $1,000,000.00+ Lanners pulled out of Profitable Dinikng, Lanners notes on the Fraudulent Transfer to Avoid Creditors, Removing Mayo's assets prior to bankruptcy, acquiring Mayo's restaurants to continue paying Lanners-Dining-In rent, and the Affinity Fraud plan to have Mayo deceive investors in Profitable Dining without Lanners or Mayo paying for their stock they sold.

## STATUTE OF LIMATIONS HAS NOT EXPIRED FOR CONSPIRACIES AND CONTINUING XXXXXXXVII

Marsala asserts that laws and numerous case law toll the statute of limitations for Fraudulent Concealment 15USC15b and On-going Entity as the restaurants are still operation.  In US v. Salmonese 352 F. 3d 608, 614-17 – \Conspiracies live on as long as the conspirators continue to receive economic benefits of the scheme".  In Smith v. United States 11-8976 the Supreme Court stated "Having joined forces to achieve collectively more evil than he could accomplish alone, Smith tied his fate to that of the group…." Exhibit 46

## XXXXXXXVIII

Marsala asserts that Georgia Law applies which has a ten year statute of limitations on Fiduciary Responsibility, with acts in Aug 2004 to default to GE Finance and leave Marsala to pay; the false testimony in depositions in 2007, and the failure to respond to emails in 2013. GA Code 9-3-96 Tolling for Fraud from time of Discovery- Gabet's emails of Dec 2012.

**XXXXXXXIX**

Marsala has a settlement agreement Lanners that includes other companies Lanners was a partner in. However, Lanners and his attorney have refused to answer Marsala's emails to confirm the list of companies Lanners provided in his deposition. Exhibit 47.

## CAUSES OF ACTION AGAINST MAYO, GRAY, AND GABET

**XXXXXXXX**

Plaintiff repeats, re-alleges, and reiterates the allegations of fact contained within paragraphs I through XXXXXXXII with the same force and effect as if fully herein.

**XXXXXXXXI**

At all times pertinent hereto, there existed a fiduciary relationship and/or confidential relationship between the plaintiff and defendants, Mayo (since 1978), Gray(since 1978), and Gabet (since 1999) resulting from their prior personal relationships and business relationships in Profitable Dining, which includes plaintiff's inferior position as a member with a  minority interest in Profitable Dining. 15USC78C

**XXXXXXXXII**

Defendants Mayo, Gray, and Gabet committed or were part of a conspiracy to commit fraud and/or breached their fiduciary duty owed to plaintiff, causing plaintiff to suffer damage, which acts or omissions constituting fraud and/or breach of fiduciary duty being set forth more specifically below, but not limited to the following:

a) Securities Fraud 15USC78Q, 15USC78C, Rule 10b-5, by Omissions and Misrepresentations to plaintiff, fraudulent misleading, and misrepresenting to plaintiff that Profitable Dining's Operating Agreement was the same for Capitalization as GDI and SCIBMATT's and that each member would make an initial capital contribution of $200,000 with addition shares being sold to new investors at $21,000.00 per share thereby inducing plaintiff to invest and become a member of Profitable Dining, LLC.

b) Selling Marsala 12.5% of a company which only consisted of Marsala's $200,000.00 investment to receive a commission of $86,750.00 and later removing Marsala for $36,750 before profitability.  Thus committing theft by deception GA Code 14-2-621;

c)  Spending Memorial Day weekend with Gray and Mayo at Gray's condo in Florida, knowing that plaintiff's assets were in the process of being converted to SCIBMATT; but not telling him;

d)  Mayo failed to provide any capital contribution in exchange for his shares in Profitable Dining, and failed to recruit any other investors, despite representations to the contrary, which led to defaults on certain loans exposing plaintiff to personal liability in the form of personal guarantees;

e)  Failure to adequately capitalize Profitable Dining, causing its default;

f)  Promoting Profitable Dining as a Limited Liability Company, while knowing from experience that personal guarantees would be forced from plaintiff, by later advising plaintiff he would lose his investment for not signing personal guarantees,

g)  Intentionally misleading plaintiff by omissions and misrepresentations on the development costs of SCIBMATT and cash flow requirements; knowing that plaintiff would decline to invest with that knowledge;

h)  Advising Plaintiff that Mayo and Lanners had a net worth of over $20,000,000 and would be able to handle any needs resulting from personal guarantees to induce Marsala to sign personal guarantees for loans made to Profitable Dining;

i)  Acquiring three restaurants of C'est Si Bon from Mayo, which were loosing money in large numbers to save Mayo from having to pay on his personal guarantees.

j)  Misrepresenting to Marsala his need to sign personal guarantees for those restaurants, knowing the plan was to default to creditors and leave Marsala to pay the debts;

k)  Assuming an @ $210,000.00 debt to A&S Recovery at 31% interest for FF&E in Charlotte, and deceiving Marsala to loan $250,000.00 to Profitable Dining to pay that debt in 2001 and not fully repaying Marsala for the loan.  Then turning that asset over to Primax to release Mayo of his personal guarantee for the lease on Charlotte;

l)  Meeting in August 2004 to discuss a scheme to default on the debt to GE Finance and leave Marsala to pay over $440,000.00 in debt; while transferring the asset eventually to Jacksonville Dining Concepts, using Marsala as a test case for SCIBMATT get out of paying for FF&E;

21

m) Receiving $3,005.00 in dividends from Profitable Dining on ghost interest not paid to Profitable Dining but shown on the books, thus violating Sarbanes-Oxley and depriving Profitable Dining of the interest it could have earned;

n) Acts of Perjury, hindrance, and evasive actions to obstruct plaintiff's discovery of what actually happened and convince the court other actions occurred;

o) Other acts or omissions which constitute breach of fiduciary duty and/or fraud, to be shown at the trail.

## XXXXXXXXIII

As a result of defendants' fraud and/or breach of fiduciary duty, plaintiff has been caused to suffer monetary damages in an amount to be proven at the trail of this matter.

## XXXXXXXXIV

As a result of defendants' fraud and/or breach of fiduciary duty, plaintiff is entitled to punitive damages under Georgia Law.

## CAUSE OF ACTION FOR CONTRIBUITION

## XXXXXXXXV

Plaintiff repeats, re-alleges, and reiterates the allegations of fact contained within paragraphs I through XXXXXXXV with the same force and effect as if fully set forth herein.

## XXXXXXXXVI

Plaintiff is entitled to contribution from Mayo for his pro rata shares of the settlement with GE Capital for the sum of $65,000.00 in 2005, as a result of Profitable Dining's default on certain loans. GA Code 14-9-502

## XXXXXXXXVII

Plaintiff is entitled to contribution from Mayo for his failure to contribute to the equity of Profitable Dining. Exhibit 35, Ex 59 p85 ll 1-9 GA Code 14-9-502

## CAUSE OF ACTION FOR CONSTRUCTIVE TRUST GA Code 23-2-51

### XXXXXXXXVIII

Plaintiff is entitled to constructive trust against the companies of Mayo, Gray, and Gabet who obtained Marsala's funds through deception, conversion, and fraud.  GA Codes 16-8-2; 16-8-3; 16-8-4

Those companies include but are not limited to SCIBMATT, A&S Recovery, Jacksonville Dining Concepts, possibly Marketshare, and Jerry Mayo Investments.

Georgia Law sets the time limit for the statute of limitations as "long term acquiescence", although defendants evasive actions have thwarted plaintiff's pursuit of justice, plaintiff has never acquiesced to the use of his funds to benefit their other businesses. Georgia Code 9-3-96 tolls for Fraud until time of Discovery

### CAUSE OF ACTION ON PROMISORY NOTE TO PROFITABLE DINING

### XXXXXXXXIX

Whereas Mayo has stated that Marsala's loan to Profitable Dining was to pay A&S Recovery for FF&E assets A&S Recovery leased to Profitable Dining and collected @ $4,100,000.00 from Mayo for Mayo's personal guarantee on said equipment, Marsala is entitled to profits generated under Constructive Trust.  Exhibit 26,28, 59 p

The loan was for $250,000.00 at 10% with a total due of $289,000.00 of which only $254,000.00 was paid.

Gray stated in his deposition that profits from A&S Recovery were split with Mayo, but refused to supply financials showing how much and when had been paid to Mayo.

### PROBABLE DEFENSES, STATUTE OF LIMITATIONS, ON-GOING CONSPIRACIES, TOLLING

### XXXXXXXXX

It is expected that defendants will look to find all sorts of legal methods to defeat plaintiff's claims of Securities Fraud, breach of fiduciary responsibility, larceny, theft by conversion, Financial Institution Fraud to obtain loans showing $21,000,000 in net worth and then suddenly "zero" net worth, and Fraudulent Transfer to Avoid Creditors; and as demonstrated in the previous case will use an attorney(s) well respected by the court to present their perjured story based on declarations and half-sentences in depositions.  However the evidence is overwhelming, the checks Transferring Marsala's funds to SCIBMATT are real, the Jacksonville Copeland's has never closed its doors nor

"failed", Gray or A&S Recovery should have received $4,100,000.00 from the sale of Mayo's Universal Solutions' stock in 2005. Why couldn't his Fraternity Brothers just tell Marsala in May 1998, they were going to transfer his funds to SCIBMATT before the sale of the Security?

Besides Fiduciary responsibility, Lanners, Gray, Mayo, and Gabet have a higher obligation to Dr. Warden, and Dr. Avara than to charge them 31% interest on a loan that Mayo had already repaid and Profitable Dining had assumed. They also had Moral and Fraternal obligations to Marsala to inform him of the deletion of the capitalization sentence in the operating agreement and the immediate transfer of his funds to their other businesses.

Affinity Fraud has become so common in America that numerous Georgia, Louisiana, and Federal Laws have been written to stop such Frauds such as Sarbanes-Oxley, Rule 10b-5, and a detailed list of actions that prevent Fraudulent Transfer to Avoid Creditors. Many states have created programs to educate.

Gray was quick to say in his deposition that Mayo had waited just past the twenty-four month period for bankruptcy preference after transferring his Universal Solutions stock to Gray for the A&S Debt; and Lanners waited just past the five years on Securities Fraud; but Conspiracy Laws for Fraudulent Concealment toll such actions and make all members of the conspiracy liable for the actions of any member.  Exhibit 46 with cases listed.

The actions of the "LA Mafia" and their co-conspirators go past the release Lanners obtained.

Mayo and Cindy Gray denied that Mayo was part of A&S Recovery during filings and depositions the 2006-2007 case. Yet Cindy Gray signed a Financial statement that the Gray's only owned 50% of A&S Recovery and could not explain who the Partners were in the "Partner's Dinners" in the copies of the check register. Exhibits 55, 63, & 64

Gray stated that Mayo felt bad for getting Gray into Copelands as a reason for Mayo transferring the stock to Gray. It is inconceivable that Mayo felt good about deceiving Marsala, Warden, Avara, Myhall, Reece, Ericsson Telcom, Avaya, Dun & Bradstreet, AM/EX and a host of others.  In Exhibit 56, Mayo emails that A&S is part his.

At the heart of the matter could be Judge Feldman's Summary Judgment, denying Marsala the right to a trial.  To which Marsala responds with Exhibit 17 from the Appeals Court Reversing Judge Porteous' decision on Summary Judgment in Turner v. Pleasant for "Relying Heavily" on defense attorneys with established relationships.

**CODE OF ETHICS 3.3 and 3.4 PREVENTING THE PRESENTAITONS OF FALSE EVIDENCE**

## XXXXXXXXXI

The Attorney Code of Ethics Sections 3.3 and 3.4 prohibit attorneys from presenting false evidence to the court. In Exhibit 1 are $160,000.00 in checks from Profitable Dining to SCIBMATT in Exhibit 9; Michael Grays' attorney writes:" …there were no financial transactions between SCIBMATT and Profitable Dining. False Evidence per Exhibit 1. "In Exhibit 38, Gabet stated SCIBMATT was hired in 2003 to help Profitable Dining- how was SCIBMATT paid?  Was this just a means to take more cash out of Profitable Dining?

## XXXXXXXXXII

Plaintiff, Charles E. Marsala, requests a jury trail on all issues trialable by jury.

Wherefore, plaintiff prays that a copy of this Complaint be duly served upon the defendants, Jerry L.Mayo, Michael Gray, Jerry Gabet, A&S Recovery, Jacksonville Dining Concepts, and SCIBMATT allowing plaintiff recovery of all damages sustained by him as a result of the actions of defendants, Jerry L.Mayo, Michael Gray, Jerry Gabet, A&S Recovery, Jacksonville Dining Concepts, and SCIBMATT as set forth above, along with punitive damages, interest, costs, and attorney fees, and any and all equitable relief. Furthermore, plaintiff prays for and desires a trial by jury.

Respectfully Submitted,

----------------------------
Charles E. Marsala
3302 Monteigne Place
Monroe, LA 71201
(650) 333-8212